CASE NO. 24-1767

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____

**Peter Gumm**

*Plaintiff-Appellant*

*v.*

**AK Steel Corp. (n/k/a Cleveland-Cliffs Steel Corporation)**

*Defendant-Appellee*

On Appeal from the United States District Court
for the Eastern District of Michigan, Southern Division
Case No. 2:21-cv-12441

**BRIEF OF APPELLEE**
**ORAL ARGUMENT REQUESTED**

| | |
|---|---|
| Carla D. Aikens | Melissa M. Tetreau |
| Carla D. Aikens, P.L.C. | Bodman PLC |
| 615 Griswold Street, Suite 709 | 201 W. Big Beaver, Suite 500 |
| Detroit, MI 48226 | Troy, MI 48084 |
| carla@aikenslawfirm.com | mtetreau@bodmanlaw.com |
| (844) 835-2993 | (248) 743-6078 |
| Attorney for Plaintiff-Appellant | Attorney for Defendant-Appellee |

4857-6655-0014_4

## <u>CORPORATE DISCLOSURE</u>

Pursuant to 6th Cir. R. 26.1, Defendant-Appellee AK Steel Corp. (n/k/a Cleveland-Cliffs Steel Corporation) makes the following disclosure:

1.      Is said party a subsidiary or affiliate of a publicly owned corporation?

Yes.  Defendant-Appellee AK Steel Corporation was acquired by Cleveland-Cliffs, Inc., renamed Cleveland-Cliffs Steel Corporation, and is now a subsidiary of Cleveland-Cliffs, Inc.

2.      Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

No.

4857-6655-0014_4

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................4

STATEMENT IN SUPPORT OF ORAL ARGUMENT ...........................5

STATEMENT OF JURISDICTION.......................................................6

COUNTER-STATEMENT OF ISSUES ................................................7

COUNTER-STATEMENT OF THE CASE .............................................8

SUMMARY OF THE ARGUMENT ....................................................20

ARGUMENT ................................................................................20
   A. Standard of Review.................................................................20
   B. Gumm's ELCRA claims are time-barred and the District Court's
      ruling should be affirmed. ....................................................21
   C. Gumm has no evidence of retaliation and the District Court's ruling
      should be affirmed. ..............................................................24
      1. Gumm cannot establish a prima facie case of retaliation.........................24
      2. AK Steel had a legitimate business reason for Gumm's
         termination.................................................................27
      3. Gumm has no evidence to demonstrate that AK Steel's reason for
         termination was mere pretext. .......................................27
         i. AK Steel's reason for termination had a clear basis in fact. ..............28
         ii. Gumm's comments actually motivated the termination decision.......29
         iii. Gumm's comments were sufficient to warrant termination...............32
   D. The District Court's dismissal of Gumm's hostile work environment
      claim should be affirmed. .....................................................33
      1. Gumm did not exhaust administrative remedies with respect to his
         hostile work environment claim. ..................................33
      2. Gumm has no evidence of a hostile work environment and the
         District Court's ruling should be affirmed. ................34

CONCLUSION.............................................................................37

CERTIFICATE OF COMPLIANCE....................................................38

CERTIFICATE OF SERVICE ..........................................................39

ADDENDUM: RELEVANT DISTRICT COURT DOCUMENTS ......................40

4857-6655-0014_4

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Clark v. Daimler Chrysler Corp.*, 268 Mich. App. 138, 142 (2005)............... 21, 24

*Cleveland v. S. Disposal Waste Connections*, 491 F.App'x 698, 707(6th Cir. 2012) .................................................................................................................34

*Diamond v. USPS*, 29 Fed. Appx. 207, 212 (6th Cir. 2002)....................................36

*Dixon v. Ashcroft*, 392 F.3d 212, 217 (6th Cir. 2004) ..............................................33

*Faragher v. City of Boca Raton,* 524 U.S. 775, 806 (1998)............................. 32, 35

*French v. MidMich. Med. Ctr.-Gladwin*, Case No. 360239 (Mich. Ct. App. Mar. 23, 2023) .......................................................................................................23

*Guarino v. Brookfield Twp. Trustees,* 980 F.2d 399 (6th Cir. 1992) .....................20

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) ................................................35

*Jones v. City of Franklin,* 309 Fed. App'x 938, 943-44 (6th Cir. 2009).................34

*Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598-99 (6th Cir. 2007) ....28

*Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000) ....... 36, 37

*Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) ............................24

*Romans v. Mich. Dept. of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012).........27

*Rory v. Continental Ins. Co.*, 473 Mich. 457 (2005) ............................ 21, 22, 24, 26

*Timko v. Oakwood Custom Coating, Inc*, 244 Mich. App. 234 (2001)...................21

*Waggoner v. Carlex Glass Am., LLC*, 682 F. App'x 412, 417 (6th Cir. 2017).........33

*Wasek v. Arrow Energy Servs., Inc*., 682 F.3d 463, 472 (6th Cir. 2012) ...............24

*Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 407 (6th Cir. 1997)................................32

*Weaver v. Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D. Ohio 1998), *aff'd*, 194 F.3d 1315 (6th Cir. 1999) ...............................................................26

*Wiloughby v. Allstate Ins. Co.*, 104 Fed. Appx. 528, 531 (6th Cir. 2004)...............26

4857-6655-0014_4

## <u>STATEMENT IN SUPPORT OF ORAL ARGUMENT</u>

Defendant-Appellee requests oral argument. While the material facts of this matter are undisputed, Plaintiff-Appellant has made a number of arguments in support of his appeal which either misstate or distort these facts. Oral argument will offer the parties an opportunity to distill the record and clarify that what few facts may be disputed are immaterial to the outcome of this case.

4857-6655-0014_4

## **STATEMENT OF JURISDICTION**

Defendant-Appellee agrees with Plaintiff-Appellant's jurisdictional statement.

4857-6655-0014_4

## <u>COUNTER-STATEMENT OF ISSUES</u>

1.  Are Plaintiff-Appellant Peter Gumm's Elliott-Larsen Civil Rights Act claims barred by the contractual limitations period?

    Defendant-Appellee answers, "Yes."

    District Court answered, "Yes."

2.  Are Plaintiff-Appellant Peter Gumm's claims for retaliatory hostile work environment barred for failure to exhaust administrative remedies?

    Defendant-Appellee answers, "Yes."

    District Court answered, "Yes."

3.  Can Plaintiff-Appellant Peter Gumm maintain a claim for retaliatory hostile work environment?

    Defendant-Appellee answers, "No."

    District Court answered, "No."

4.  Can Plaintiff-Appellant Peter Gumm maintain a claim for retaliation?

    Defendant-Appellee answers, "No."

    District Court answered, "No."

4857-6655-0014_4

## COUNTER-STATEMENT OF THE CASE

In April of 2015, Peter Gumm was hired as a Shift Manager in the Slab Yard at AK Steel's Dearborn Works facility in Dearborn, Michigan.[1] (Gumm Deposition, R. 34-2, Page ID 335.)  In connection with his hire at AK Steel, Gumm submitted an Application for Salaried Employment, which included the following provision:

\*\*\*

**I agree and understand that any action, suit, or charge against the Company arising out of my employment or termination of employment, including, but not limited to, claims arising under State or Federal Civil Rights statutes, must be brought within 180 days of the event, giving rise to the claims or be forever barred. I waive any limitations periods exceeding 180 days.**

(Application for Salaried Employment, R. 34-4, Page ID 445.)  Immediately below this language, Gumm signed his name and dated his signature. (*Id*.) Gumm's deposition testimony confirms that he read the application, completed it, and signed it. (Gumm Deposition, R. 34-2, Page ID 335.)

Gumm first worked as a Shift Manager, where he was responsible for directly supervising, staffing and scheduling hourly workers, from 2015 to 2017. (*Id.* at Page ID 335.)  In 2017, Gumm was promoted to Section Manager of the Hot Strip Mill

---

[1] Through the duration of Gumm's employment, he was employed by AK Steel Corporation. Cleveland-Cliffs Inc. acquired AK Steel after Gumm was terminated and renamed the company "Cleveland-Cliffs Steel Corporation."  For ease of reference, Appellee will refer to itself in this brief as "AK Steel."

4857-6655-0014_4

Logistics Department. (*Id.* at Page ID 336.) As Section Manager, Gumm had four shift managers and a day manager reporting to him, in addition to the hourly workers. (*Id.* at Page ID 337.)

In May of 2018, LaDale Combs (a Black male) became the Department Manager of the Hot Strip Mill. (Combs Declaration, R. 34-5, Page ID 447; Combs Deposition, R. 34-6, Page ID 453.) In late 2018 or early 2019, Combs held a "town hall" meeting with the Hot Strip Mill to meet his employees and learn more about the department. (Combs Deposition, R. 34-6, Page ID 467-468, 470.) After the town hall meeting, several employees approached Combs with complaints about Gumm, ranging from communication issues to unfair treatment. (*Id.* at Page ID 468, 470.)

Shortly thereafter, Combs was approached by a Union Representative who asked Combs to meet with some of the hourly Hot Strip Mill employees because, "they were having some issues with Mr. Gumm." (*Id.* at Page ID 461.) During this meeting, hourly employees again raised complaints about Gumm that ranged from unfair work assignments to a lack of communication to blatant favoritism and disrespect. (*Id.*)

A few months later, Combs was promoted to General Manager of the Dearborn Works facility. (Combs Declaration, R. 34-5, Page ID 448.) As General Manager, Combs continued to engage with the workforce through town hall meetings and Gumm continued to be a topic of discussion. (*Id.*)  At one of these

9

town hall meetings, an hourly employee approached Combs and Human Resources Manager Annette Gibbons to complain "that his son was in the hospital and he had called to get…the shift off and was told that Mr. Gumm said he didn't give [a f\*\*k] if his son was in the hospital. He had to come to work." (Gibbons Deposition, R. 34-3, Page ID 383.)

In January of 2019, Combs received the confidential results of the annual employee surveys, which solicit anonymous employee feedback. (Combs Deposition, R. 34-6, Page ID 464.) The results of the survey indicated that Gumm was unresponsive and did not treat his employees fairly. (*Id.* at 465.) For instance, one comment stated "Pete Gumm is our area manager apparently he's too good to answer his phone or text message we send him, will not communicate with employees." (*Id.* at Page ID 466.) Another comment stated that "Pete Gumm believes we are mindless drones. His management style is void of purpose, and is generally thought to be patterned after an ill-conceived attempt at being a 'worst' case scenario." (*Id.* at Page ID 467.)

Management also directly observed Gumm making poor impressions on those he worked with. In a meeting Gibbons held with Gumm and Patti Salaz, a union representative, "Pete was very disrespectful…[s]o much so that [Gibbons] had to call a pause and had the union rep step out while [she] spoke to Pete." (Gibbons Deposition, R. 34-3, Page ID 384.)  At another time, Gibbons overheard Gumm

10

bragging about how he made a supervisor cry. (*Id.* at Page ID 385.) When she asked him to repeat what he had said, "he happily repeated that he made a supervisor cry," to which she told him that was not something he should be proud of. (*Id.*) Gibbons testified that she could not recall how many informal discussions she had with Gumm about his behavior because "there were constant complaints…about the way Pete went about completing his job in reference to hourly employees." (*Id.* at Page ID 386.)

As a result of these ongoing concerns, Combs and Gibbons met with Gumm, along with Gumm's direct supervisor, Department Manager Jason Dearth. (Combs Deposition, R. 34-6, Page ID 467, 474; Gibbons Deposition, R. 34-3, Page ID 383-384.) The meeting was intended to bring the concerns directly to Gumm's attention and seek improvement from him in his dealings with his workforce. (Dearth Deposition, R. 34-7, Page ID 527; Gibbons Deposition, R. 34-3, Page ID 384.)  In response, Gumm made attempts to deflect blame. Instead of taking responsibility for his own actions, he shifted the conversation, making baseless complaints that three employees were terminated for similar drug and alcohol offenses, but only the white employee was allegedly brought back to work. (Gumm Deposition, R. 34-2, Page ID 345.) He was concerned about "the optics, it looked very, very bad…" (*Id.*) He continued that because "it was my area, [the hourly employees] assumed that I'm the one that brought him back and I told them I didn't." (*Id.*)

11

Around the same time, Gumm received his Annual Assessment for the year 2018. (2018 Annual Assessment, R. 34-8, Page ID 567-572.) His Assessment noted, under "Working with others," that "Pete needs to continue to work in this arena. He needs to work on how he interacts with other salaried and hourly employees. He can be harsh and needs to be more empathetic to others." (*Id.* at Page ID 568.) Further, under "Leading and Managing," this Assessment noted that "There's some polishing left to be done as he can be abrasive to others at times, which can be smoothed with management-style learning." (*Id.* at Page ID 569.) Gumm agreed with these assessments. (Gumm Deposition, R. 34-2, Page ID 338.)

Then, in the summer of 2019, Gumm alleges he complained to Dearth about the hiring of two white supervisors while Gumm was on vacation. (*Id.* at Page ID 341.) "[O]ne was hired into the slab yard and one was hired into the shipping department," so both of these supervisors reported to Gumm. (*Id.*) Gumm told Dearth that he "didn't agree with the hiring" of these two men. (*Id.* at Page ID 342.) He "asked why it was done while [he] wasn't there because it seemed odd to [him]." (*Id.* at Page ID 342-343.) Gumm claimed that four Black employees were interested in becoming supervisors: Jacquetta Mosley, Tarnell Williams, Oronde Brazzell, and Leswa Mosley. (*Id.* at Page ID 341-342.) Yet, Gumm is not aware of whether any of these individuals even applied for the supervisor roles for which the two white employees were hired. (*Id.* at Page ID 341.)

12

He also claims that around the same time, he complained to Combs about refusing to interview Jacquetta Mosley, saying "we need to interview her, at least give her the opportunity so we can keep her…" (*Id.* at Page ID 343.) In response, Gumm claims that Combs stated "the men didn't like her…[b]ecause she had made a complaint about one of them some time ago." (*Id.*)

In October of 2019, Evan Nowitzke, a shift manager directly reporting to Gumm, resigned. (Skubic Deposition, R. 34-9, Page ID 630; Bishop Deposition, R. 34-10, Page ID 685.) Nowitzke's exit interview revealed that Gumm was the reason for Nowitzke's resignation. (Nowitzke Exit Interview, R. 34-11, Page ID 717.) Nowitzke noted Gumm's hostile and abusive management style, saying that Gumm called employees "dumb, useless, and stupid" and showed a disregard for employee safety. (*Id.*) Gumm speciously claims he "never met" Evan Nowitzke, despite Nowitzke directly reporting to Gumm for more than three months. But regardless, it is undisputed that Nowitzke completed an exit interview stating that "[c]onflict with Peter Gumm" was the reason for his resignation. (*Id.*) After Brian Bishop, Vice President of Carbon Steel Operations, reviewed the exit interview, he directed Combs to have a counseling session with Gumm. (Bishop Deposition, R. 34-10, Page ID 687-688.) Nowitzke's feedback reinforced negative feedback from others about Gumm, and Combs determined it was time to take more aggressive action to address Gumm's unacceptable behavior. Gumm was issued a clear written warning

13

that such behavior would not be tolerated. (Combs Declaration, R. 34-5, Page ID 448.)

Both the written warning, dated November 4, 2019, and a November 1, 2019, suspension for a safety violation were delivered to Gumm in a meeting with Department Manager Jason Dearth and Human Resources Manager Joe Skubic. (Gumm Deposition, R. 34-2, Page ID 339-340.) The written warning was issued as a result of Gumm's disrespectful behavior as evidenced in the yearly employee surveys, exit interview, and verbal complaints. (*Id.* at Page ID 339; November 4, 2019 Written Warning, R. 34-12, Page ID 719; Combs Deposition, R. 34-6, Page ID 475.) Gumm's safety suspension was issued after an employee complained, and video evidence confirmed, that Gumm was "in the coil field within arm's reach of a coil without having the proper PPE on." (Gumm Deposition, R. 34-2, Page ID 339; November 1, 2019 Suspension, R. 34-13, Page ID 721.)

A few weeks later, on November 25, 2019, AK Steel received an anonymous complaint about Gumm through its Ethics and Compliance Hotline. (Combs Deposition, R. 34-6, Page ID 462.) The ethics hotline complaint alleged that Gumm created a hostile work environment by being disrespectful, seeing himself as above employees, and calling employees "nobodies" and "bitches." (November 25, 2019 Ethics Hotline Complaint, R. 34-14, Page ID 724.) The complaint also alleged that Gumm said he would "like to keep all supervisors Caucasian" because he "does not

14

like African American employees," which made the caller reluctant to apply for a supervisor position. (*Id*.)

Skubic, as Human Resources Manager, received the ethics hotline complaint. (Skubic Deposition, R. 34-9, Page ID 589.) He and Dearth then met with Gumm to advise him of the complaint and ask him to provide his side of the story. (*Id.* at Page ID 603-604.) Skubic informed Gumm of the general content of the complaint, told him that they were going to investigate the allegations, and would meet with him again upon completion of the investigation. (*Id.* at Page ID 613.) Gumm denied the allegations that he called employees "nobodies," or "bitches." (*Id.* at Page ID 619; December 2019 Skubic Notes, R. 34-15, Page ID 726.) Then, in defense to being called racist, Gumm commented that he was half Apache and half Mexican. (Skubic Deposition, R. 34-9, at Page ID 619; December 2019 Skubic Notes, R. 34-15, Page ID 726.) He also deflected yet again to his defensive claims about his attempts to refer and recruit Black employees. (Skubic Deposition, R. 34-9, Page ID 619; December 2019 Skubic Notes, R. 34-15, Page ID 726.) He also claimed that he had hired Cheryl Hoffman and Ibrahim Qasim "and neither of those two are white men." (Gumm Deposition, R. 34-2, Page ID 343.)

Because the complaint was anonymous, the Labor Relations Department started the investigation by interviewing a random sampling of hourly employees. (Skubic Deposition, R. 34-9, Page ID 604.) The hourly employees who were

15

interviewed denied experiencing any racist or discriminatory treatment. (Gibbons Deposition, R. 34-3, Page ID 389.)  Human Resources Manager Joe Skubic then continued the investigation by interviewing all five shift managers who reported to Gumm. (Skubic Deposition, R. 34-9, Page ID 604; Skubic Notes of Shift Manager Interviews, R. 34-16, Page ID 728-733.)  Gumm testified at his deposition that he had no reason to believe any of his shift managers would lie as part of the investigation. (Gumm Deposition, R. 34-2, Page ID 347.)

Brad Anthony said he worked midnights and rarely interacted with Gumm. (Shift Manager Interviews, R. 34-16, Page ID 728; Skubic Deposition, R. 34-9, Page ID 614.) The other four shift managers confirmed Gumm's disrespectful conduct. (Shift Manager Interviews, R. 34-16, Page ID 729-733; Shift Manager Declarations, R. 34-17, Page ID 735-738.) Carl Thomas stated that he had heard Gumm use profane and abusive language towards employees. (Shift Manager Interviews, R. 34-16, Page ID 729; Shift Manager Declarations, R. 34-17, Page ID 735; Skubic Deposition, R. 34-9, Page ID 614.)  Cheryl Hoffman reported hearing Gumm make racist comments. (Skubic Deposition, R. 34-9, Page ID 615; Shift Manager Interviews, R. 34-16, Page ID 730; Shift Manager Declarations, R. 34-17, Page ID 737.) She stated that she had heard Gumm say "he is stupid because he is Black," and reported that Gumm said he "needs a Black supervisor because he has been called racist." (Shift Manager Interviews, R. 34-16, Page ID 730.)  Hoffman also

4857-6655-0014_4

reported hearing Gumm make sexist comments. (Shift Manager Interviews, R. 34-16, Page ID 730.) For instance, she heard Gumm call women "ignorant" and "cry baby bitches." (Shift Manager Interviews, R. 34-16, Page ID 730.) She stated that Gumm made similar comments towards Evan Nowitzke, the supervisor who quit based on Gumm's behavior. (Shift Manager Interviews, R. 34-16, Page ID 730.) Further, Hoffman heard Gumm called a female employee a "c*nt." (Shift Manager Interviews, R. 34-16, Page ID 730.) Hoffman told Skubic that she had not previously reported this conduct because she felt Gumm was vindictive based on his threats to fire everyone. (Shift Manager Interviews, R. 34-16, Page ID 730; Shift Manager Declarations, R. 34-17, Page ID 737; Skubic Deposition, R. 34-9, Page ID 614.)

Another shift manager, Larry Kaitner, stated that while he had "only talked to [Gumm] 10 times since [he] took the job," in those interactions he heard Gumm belittle coworkers as "stupid" and make fun of a female coworker for crying. (Shift Manager Interviews, R. 34-16, Page ID 731; Shift Manager Declarations, R. 34-17, Page ID 736; Skubic Deposition, R. 34-9, Page ID 616-617.) Kaitner also reported that Gumm had destroyed the morale of the department. (Shift Manager Interviews, R. 34-16, Page ID 731.)  The fifth shift manager, Curtis Penix, stated that Gumm would regularly make derogatory comments about Black employees and women. (Shift Manager Interviews, R. 34-16, Page ID 732; Shift Manager Declarations, R. 34-17, Page ID 738; Skubic Deposition, R. 34-9, Page ID 618.) For instance, Gumm

17

would regularly tie negative behaviors to race, saying that an employee did something bad "because he is Black." (Shift Manager Interviews, R. 34-16, Page ID 733; Shift Manager Declarations, R. 34-17, Page ID 738; Skubic Deposition, R. 34-9, Page ID 618.) Penix also corroborated that Gumm had called women employees "c*nts." (Shift Manager Interviews, R. 34-16, Page ID 732; Shift Manager Declarations, R. 34-17, Page ID 738; Skubic Deposition, R. 34-9, Page ID 618.) Penix further stated that Gumm would speak disrespectfully about hourly employees, saying "If you assume an hourly employee is lying 100% of the time, you would be 100% right." (Skubic Deposition, R. 34-9, Page ID 618; Shift Manager Interviews, R. 34-16, Page ID 733; Shift Manager Declarations, R. 34-17, Page ID 738.)

During his deposition, Gumm testified that "of course" it would be disrespectful to say that someone is stupid because they are Black, to refer to women as ignorant, crybaby bitches, or c*nts, to yell at employees using language like motherf***er, to say something to the effect of if you assume hourly employees are lying 100% of the time you would be 100% right, to say that Black employees engaged in a certain negative behavior because they are Black, or to make fun of female co-workers for crying – all things he was reported to have said or done. (Gumm Deposition, R. 34-2, Page ID 349.)

18

As a result of Gumm's racist and sexist comments revealed during the investigation, coupled with the ongoing disrespectful and abusive behavior that Gumm had clearly failed to remedy, AK Steel again met with Gumm to terminate his employment. (Combs Deposition, R. 34-6, Page ID 489; Skubic Deposition, R. 34-9, Page ID 633; Skubic January 2020 Notes. R. 34-19, Page ID 742; November 25, 2019 Ethics Hotline Complaint, R. 34-14, Page ID 723.)

On August 5, 2020, more than 180 days after his termination, Gumm filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging retaliation. (EEOC Charge, R. 34-18, Page ID 740.) The EEOC dismissed Gumm's charge and issued a right to sue on July 19, 2021. On October 15, 2021, Gumm filed his Complaint. (Complaint, R. 1, Page ID 1-9.) Following discovery, AK Steel filed a Motion for Summary Judgment (Motion for SJ, R. 34, Page ID 293-325), which the District Court granted in its entirety on September 26, 2023.[2] (Opinion and Order, R. 45, Page ID 1327-1364.) Gumm then filed a Motion for Reconsideration

---

[2] In his attempt to avoid summary judgment and again in this appeal, Gumm's Statement of Facts references an unrelated lawsuit, *Eric Williams v. AK Steel* (in which AK Steel prevailed on summary judgment) to argue that a supervisor who has absolutely no involvement in Gumm's case made racially intolerant statements and threw scissors at a Black employee. These allegations were not considered in the *Williams* lawsuit because they were time-barred and hearsay, and they should not be considered now as they remain time-barred hearsay and have nothing to do with AK Steel's treatment of Gumm.

4857-6655-0014_4

(Motion for Recon, R. 48, Page ID 1387-1400), which was denied on September 11, 2024 (Opinion and Order, R. 49, Page ID 1405-1412). This Appeal followed.

## SUMMARY OF THE ARGUMENT

The District Court correctly analyzed the issues in this case and found that AK Steel had a legitimate non-retaliatory business reason for Gumm's termination – his disrespectful conduct, and his sexist and racist comments. Applying the familiar *McDonnell Douglas* burden-shifting analysis, even if Gumm could establish a prima facie claim of retaliation, AK Steel has met its burden of proving a legitimate reason for its actions. When the burden shifts back to Gumm, he cannot offer any genuine issue of material fact that would demonstrate this reason for termination was pretext for retaliation.

Additionally, the District Court correctly ruled that Gumm's state law claims are time-barred and that his Title VII hostile work environment claim was not administratively exhausted. Yet, even if this Court disagrees, Gumm cannot prevail on these claims. The District Court's grant of summary judgment to AK Steel should be affirmed in its entirety.

## ARGUMENT

### A.    Standard of Review.

This Court reviews the grant of summary judgment de novo. *Guarino v. Brookfield Twp. Trustees,* 980 F.2d 399 (6th Cir. 1992).

4857-6655-0014_4

**B.**    **Gumm's ELCRA claims are time-barred and the District Court's ruling should be affirmed.**

Gumm agreed in his Application for Salaried Employment not to commence any legal action against AK Steel more than 180 days after the date of the event giving rise to the claims and to waive any statute of limitations to the contrary. Immediately below this language, Gumm signed his name and dated his signature. (Application for Salaried Employment, R. 34-4, Page ID 445.) Gumm's deposition testimony confirms that he read the application, completed it, and signed it. (Gumm Deposition, R. 34-2, Page ID 335.)

Following his termination from AK Steel on January 10, 2020, Gumm filed a Charge of Discrimination with the EEOC more than 180 days later, on August 5, 2020. He then filed his Complaint to initiate his lawsuit on October 5, 2021, more than a year and a half after his employment ended. Therefore, his claims under the Elliott-Larsen Civil Rights Act ("ELCRA") are untimely.

Employers and employees may agree to a shortened limitations period, and if the provision is unambiguous, a court must enforce the provision as written unless it violates the law or public policy. *Rory v. Continental Ins. Co.*, 473 Mich. 457 (2005). Michigan Courts of Appeals have consistently held that there is no "inherent unreasonableness" in a six-month period of limitation. *Timko v. Oakwood Custom Coating, Inc*, 244 Mich. App. 234 (2001). *See also, Clark v. Daimler Chrysler Corp.*,

21

268 Mich. App. 138, 142 (2005). In *Rory*, the Michigan Supreme Court acknowledged that "when a court abrogates unambiguous contractual provisions based on its own independent assessment of 'reasonableness,' the court undermines the parties' freedom of contract." *Rory*, 473 Mich at 470. As a result, if the shortened limitations period is unambiguous and does not violate public policy, it must be upheld. *Id.*

Here, Gumm does not argue that the language in his Application for Salaried Employment is ambiguous or that it violates public policy. He clearly agreed "that any action, suit, or charge against the Company arising out of [his] employment or termination of employment….must be brought within 180 days of the event giving rise to the claims or be forever barred." (Application for Salaried Employment, R. 34-4, Page ID 445.) He explicitly agreed to "waive any limitations period exceeding 180 days." (*Id.*) Despite these agreements, Gumm now cites *McMillon v. City of Kalamazoo* to argue that the 180-day limitations period in his employment application is not binding. 983 N.W.2d 79 (Mich. 2023). In *McMillon*, the plaintiff signed an application in 2004 that contained a shortened limitations period. *Id*. at 80. However, she was not hired for the position for which she applied. *Id*. More than a year later, the City contacted plaintiff to inquire whether she was interested in a different position. *Id*. In connection with her renewed application process, she did not complete a new employment application. *Id*. As a result, the Court found an issue

22

of material fact as to whether the plaintiff "had notice of the use of the prior application materials' future employment-related terms and whether she agreed to be bound by those materials." *Id*. at 81. This is not the case here.

In *French v. MidMich. Med. Ctr.-Gladwin*, the Court analyzed the applicability of *McMillon* to facts similar to those in this case. Case No. 360239 (Mich. Ct. App. Mar. 23, 2023) (*French,* R. 40-2, Page ID 1313-1318.). "*McMillon* is distinguishable from this case, however, because unlike the plaintiff in *McMillon*, plaintiff here was hired initially by [Defendant].... Thus, the question of whether there was notice that defendant would use plaintiff's application materials is irrelevant because plaintiff was hired immediately, always remained an employee of [defendant] and was, therefore, always bound by the terms [he] agreed to in 201[5]." (*Id.* at Page ID 1317.)

Further, Gumm argues he should not be bound by the shortened limitations period because he was allegedly unaware that he had entered into such an arrangement. This is unpersuasive. As the court in *French* reiterated, "one who signs a contract will not be heard to say, when enforcement is sought, that he did not read it, or that he supposed it was different in its terms." *Id*. (internal quotes omitted).

Finally, Gumm asks this Court to reverse the district court's ruling on the off chance that the Michigan Supreme Court changes course in the *Rayford v. American House Roseville I* case pending before that Court. Gumm offers no legal support for

his suggestion that this Court should refuse to apply binding authority based on speculation that the law might change. The law in Michigan is clear that contractual six-month limitations periods do not violate the law or public policy and must be enforced. *Rory*, 473 Mich at 470; *Clark v. Daimler Chrysler Corp,* 268 Mich App at 142-43. The District Court reached the proper conclusion – that Gumm's claims under the Elliott-Larsen Civil Rights Act are time-barred. AK Steel respectfully requests this Court affirm that conclusion.

## C.  Gumm has no evidence of retaliation and the District Court's ruling should be affirmed.

Gumm cannot establish a prima facie case of retaliation under either Title VII or the ELCRA. To establish his claim of retaliation under either statute, Gumm must prove (1) he engaged in protected activity; (2) the exercise of his rights was known to AK Steel; (3) AK Steel took an adverse employment action against him; and (4) there was a causal connection between the protected activity and the adverse employment action. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000); *Wasek v. Arrow Energy Servs., Inc*., 682 F.3d 463, 472 (6th Cir. 2012).

### 1.  Gumm cannot establish a prima facie case of retaliation.

Gumm claims that he engaged in protected activity by making complaints of alleged discriminatory treatment that he witnessed. He has identified three such complaints and admits he made no other complaints. (Gumm Deposition, R. 34-2,

24

Page ID 349-350.)  As explained above, beginning in the summer of 2019, Gumm made two complaints about Black employees not being considered for salaried positions, and one complaint about the reinstatement of two white employees while delaying reinstatement for a Black employee who committed a similar offense.

None of these alleged complaints, however, constitute protected activity. Each of these complaints was raised by Gumm in a defensive posture after it became clear to him that he was being held accountable for his own disrespectful conduct. (*Id.* at Page ID 345.) Indeed, with respect to his complaint about the alleged failure to reinstate a Black employee, Gumm candidly shared that his concern was with "optics," and that employees thought he made the reinstatement decisions because they were in his department. These complaints were nothing more than self-serving deflection and were not made in good faith.

Further, none of the complaints articulated a belief that discrimination was occurring – only that he disagreed with these managerial decisions. At no point did Gumm state that he felt AK Steel was discriminating against any Black employees based on race or any other protected characteristic. (*Id.* at Page ID 343.) He was merely stating that there were Black employees who may have been interested in promotional opportunities, he was upset that he was not consulted on the hiring of two white supervisors or the reinstatement of white employees, and that the "optics" were bad when bringing back white employees. "[A] vague complaint that does not

25

reference conduct made unlawful under Title VII is not protected activity." *Soehner v. Time Warner Cable, Inc.*, Case No. 1:08-cv-166., 2009 BL 246785, at *9 (S.D. Ohio Nov. 16, 2009) (*Soehner*, R. 34-24, Page ID 756-763.) This Court has repeatedly held that complaints of unfair treatment in general, or complaints "contesting the correctness of a decision" are not protected activity under Title VII. *See, Weaver v. Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D. Ohio 1998), *aff'd*, 194 F.3d 1315 (6th Cir. 1999); *Wiloughby v. Allstate Ins. Co.*, 104 Fed. Appx. 528, 531 (6th Cir. 2004). At most, Gumm's complaints contested the accuracy or fairness of these three decisions, and such complaints are not protected activity under Title VII. *See, Weaver*, 71 F.Supp.2d at 793-94, *aff'd*, 194 F.3d 1315 (6th Cir. 1999); *Wiloughby*, 104 Fed. Appx. at 531.

Moreover, Gumm's termination was not causally connected to any purported protected activity. As explained above, Gumm's inappropriate conduct had been on Combs' radar since 2018. The final straw came, not when Gumm made vague complaints about management's decisions but, when an anonymous caller made an ethics hotline complaint alleging that Gumm made disrespectful, racist, and misogynistic comments. After Skubic, who was not involved in any of Gumm's prior "complaints," conducted a thorough investigation, it was determined that termination of employment was warranted. Even if Gumm had engaged in protected activity, his termination was in no way related to that activity.

26

### 2. AK Steel had a legitimate business reason for Gumm's termination.

Even if Gumm could establish a prima facie case of retaliation, he cannot rebut AK Steel's legitimate business reason for termination. As explained above, in response to the ethics hotline complaint accusing Gumm of disrespectful and racist behaviors, AK Steel conducted a prompt and thorough investigation. This investigation revealed that Gumm engaged in egregious and unacceptable conduct, including making racist and misogynistic comments about employees. These findings, against a backdrop of several months of reports of Gumm's abrasive and even abusive management style, left AK Steel with little choice but to terminate Gumm's employment.

### 3. Gumm has no evidence to demonstrate that AK Steel's reason for termination was mere pretext.

Given AK Steel's articulated legitimate business reason for terminating Gumm's employment, the burden shifts to Gumm to demonstrate that this reason was a pretext for retaliation. To demonstrate pretext, Gumm must show either "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Romans v. Mich. Dept. of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012) (internal citations omitted).

27

### i. AK Steel's reason for termination had a clear basis in fact.

While Gumm denies making any of these statements, this does not matter. The Sixth Circuit has adopted the honest belief rule, "reasoning that it is not in the interests of justice for [courts] to wade into an employer's decisionmaking process." *Id*. at 763 (citing *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598-99 (6th Cir. 2007). Instead, the court looks to the employer's honest belief, "and whether it is informed and nondiscriminatory." Here, Gumm agreed that AK Steel had an obligation to investigate the November 25, 2019 ethics hotline complaint made against him. (Gumm Deposition, R. 34-2, Page ID 346.) AK Steel conducted a fair and thorough investigation, and received reports from nearly every one of Gumm's direct reports that Gumm was rude, vulgar, and made comments that were racist and misogynistic. Even Gumm does not believe that his shift managers would lie, and thus AK Steel was entitled to rely upon their statements.

Gumm testified that he had no reason to believe that any misconduct occurred in the course of the investigation. (*Id.* at Page ID 349.) Yet, he now attempts to prove pretext by arguing that AK Steel's investigation into the November 25, 2019, ethics hotline complaint was "shoddy." For instance, Gumm claims that the interviews were conducted "in his absence, without informing him of the accusations and giving him an opportunity to defend himself," but this is simply false. While of course the

4857-6655-0014_4

interviews took place in his absence, AK Steel informed Gumm of the general content of the complaint before any interviews were conducted. Skubic asked him to provide his side of the story, told him that he was going to investigate the allegations, and would meet with him again upon completion of the investigation, and in fact Skubic did just that. (Skubic Deposition, R. 34-9, Page ID 613.) There was no "selective" or "exclusionary" process, and Gumm even testified that he had no reason to believe any of his shift managers would lie, and no knowledge of any unethical conduct in the investigation. (Gumm Deposition, R. 34-2, Page ID 347, 349.) There is no basis to conclude that AK Steel's investigation was anything but fair and thorough.

### ii.   Gumm's comments actually motivated the termination decision.

Further, there is no evidence that Gumm's sexist and racist comments did not actually motivate the termination decision. In attempt to cast doubt on the decision, Gumm points to 1) his "long-standing positive performance record," 2) a "questionable" safety violation and "post-hoc" suspension," and 3) the contrast in investigative response to his alleged complaints and the complaints made about him.

Initially, his claim of a "long-standing positive performance record" completely ignores the negative feedback on Gumm's management and communication, which was clearly reflected in Gumm's performance evaluations.

29

This negative feedback was a recurring theme in town hall meetings, employee surveys, complaints from union representatives, a critical exit interview and, finally, an anonymous ethics hotline complaint.

Gumm then argues that a "questionable" complaint about his failure to wear protective equipment further supports his pretext arguments. There is nothing "questionable" about the complaint. An anonymous complaint indicated that Gumm was "in the coil field within arm's reach of a coil without having the proper PPE on." (Gumm Deposition, R. 34-2, Page ID 339; November 1, 2019 Suspension, R. 34-13, Page ID 721.) Video evidence confirmed that Gumm committed this safety violation. (Gumm Deposition, R. 34-2, Page ID 339.) In his deposition, Gumm himself confirmed this, stating "I was in the coil field within arm's reach of a coil without having the proper PPE on." (*Id.*)

Moreover, there was no "post-hoc suspension" for this safety violation. Gumm claims in his declaration that he was never suspended and was never informed that he was being suspended, but this directly contradicts his sworn deposition testimony and should not be considered. (*Id*.) *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986). In any event, Gumm's contentions about his November 2019 suspension are a red herring because this suspension played no role in his discharge. Gumm was not terminated based on progressive discipline including the suspension, nor did the suspension weigh on the termination decision.

30

His termination was based on the outcome of the investigation into the November 25, 2019, ethics hotline complaint, against the backdrop of his longstanding abusive management style.

Finally, Gumm laments the fact that his "complaints" were not given the same attention as the ethics hotline complaint filed against him. But, Gumm never actually accused anyone of racist conduct or other action which would warrant an investigation. Rather, he expressed his disagreement with managerial decisions, and in particular his concern with how the optics of these decisions would make him look to other employees. These were managerial disagreements, not complaints of unlawful conduct.

Despite Gumm's efforts to cast doubt as to the motivations of AK Steel's investigation and his subsequent termination, the evidence is clear that the investigation was reasonable, that the language and behavior revealed by the investigation was reprehensible, and that these latest reports of Gumm's egregious misconduct became the final straw leading to his discharge. (Combs Deposition, R. 34-6, Page ID 489; Skubic Deposition, R. 34-9, Page ID 633; Bishop Deposition, R. 34-10, Page ID 688; Dearth Deposition, R. 34-7, Page ID 523.)

### iii. <u>Gumm's comments were sufficient to warrant termination.</u>

Finally, there is no doubt that the unacceptable behavior uncovered in the investigation warranted discharge. There can be no question that a Section Manager who calls females "c*nts," says that employees are stupid because they are Black, and makes fun of female co-workers for being "crybaby bitches" should be terminated. Multiple witnesses confirmed that Gumm said each of these things and more. Even Gumm agreed that such statements are disrespectful. Such behavior is not only a violation of AK Steel's policy, but also requires remedial action as a matter of law. (Anti-Harassment Policy, R. 34-22, Page ID 750-751.) *Faragher v. City of Boca Raton,* 524 U.S. 775, 806 (1998) (employers must take prompt action sufficient to end the harassment); *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 407 (6th Cir. 1997) (finding employer's response adequate where it "put an end to the behavior of which [plaintiff] complained"). Gumm cannot reasonably argue that the egregious behavior revealed by the investigation did not warrant termination.

Gumm's termination was not pretextual; it was based on a full and fair investigation, which uncovered disgraceful management behaviors, including multiple racist and misogynistic comments. Without any evidence of pretext, summary judgment was properly granted in favor of AK Steel.

32

**D.     The District Court's dismissal of Gumm's hostile work environment claim should be affirmed.**

**1.     Gumm did not exhaust administrative remedies with respect to his hostile work environment claim.**

Gumm's Title VII claim that he was subjected to a hostile work environment was properly dismissed because it was not administratively exhausted. "[T]he general rule in this circuit … [is] that the judicial complaint must be limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." *Dixon v. Ashcroft*, 392 F.3d 212, 217 (6th Cir. 2004). In other words, Gumm cannot bring a lawsuit for hostile work environment "unless the allegations in the complaint can be reasonably inferred from the facts alleged in the charge." *Waggoner v. Carlex Glass Am., LLC*, 682 F. App'x 412, 417 (6th Cir. 2017).

In his Charge, Gumm checked only the box for "retaliation." (EEOC Charge, R. 34-18, Page ID 740.) The narrative section of the charge similarly focuses solely on his belief "that [he] ha[d] been discharged in retaliation for opposing what [he] sincerely believe[d] to be discrimination based on race, in violation of Title VII of the Civil Rights Act of 1964, as amended." (*Id*.) Nowhere in his Charge does he claim, as he does in his Complaint, that he had "an unworkable work environment," that "the situation [was] untenable," or that AK Steel ever "created an intimidating, hostile, and offensive work environment." (Complaint, R. 1, Page ID 7.) Nor can these allegations be reasonably inferred from the bare facts stated in the Charge. *See,*

4857-6655-0014_4

*e.g.*, *Jones v. City of Franklin,* 309 Fed. App'x 938, 943-44 (6th Cir. 2009)**Error! Bookmark not defined.** ("No decision in this circuit has held that EEOC charges regarding discrete acts of discrimination are alone sufficient to put the EEOC on notice of a hostile-work-environment claim.... [Thus, the district court] did not err in dismissing the plaintiffs' hostile-work-environment claims brought under Title VII."). As a result, Gumm's hostile work environment claims must be dismissed for failure to exhaust administrative remedies.

### 2. <u>Gumm has no evidence of a hostile work environment and the District Court's ruling should be affirmed.</u>

Even if Gumm's retaliatory hostile work environment claims were not procedurally barred, the claims are substantively without merit. To prevail on a claim of retaliatory hostile work environment under either state or federal law, Gumm must show (1) he engaged in protected activity; (2) AK Steel was aware that he engaged in the protected activity; (3) Gumm suffered severe or pervasive retaliatory harassment; and (4) there was a causal connection between the protected activity and the harassment. *Cleveland v. S. Disposal Waste Connections*, 491 F.App'x 698, 707 (6th Cir. 2012) (internal quotations omitted).

As explained above, none of Gumm's "complaints" amount to protected activity necessary to prove a retaliatory hostile work environment. Instead, his

alleged complaints were mere deflections made when he was defensive about his own conduct or how he might be perceived.

Further, the only alleged "harassment" claimed in Gumm's complaint is AK Steel's investigation into the November 2019 ethics hotline complaint against Gumm. (Complaint, R. 1, Page ID 3.) Gumm cannot demonstrate that this constitutes severe or pervasive harassment. Whether alleged harassment is sufficiently severe or pervasive to create a hostile work environment depends on a variety of factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it reasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). There is no dispute that AK Steel did, in fact, receive complaints of discriminatory and harassing behavior by Gumm himself, and that it acted on those complaints in good faith. Nothing about this investigation was "threatening," "humiliating," or otherwise "offensive." Gumm has no evidence that this investigation was anything other than a proper (indeed, necessary) response to serious allegations of Gumm's own misconduct. *Faragher v. City of Boca Raton,* 524 U.S. 775, 806 (1998) (requiring employees on notice of behavior that potentially violates Title VII to promptly initiate an investigation). It defies logic for Gumm to admit the investigation was

35

necessary (Gumm Deposition, R. 34-2, Page ID 346) and now claim it was, in fact, harassment.

Finally, there is no causal connection between Gumm's "complaints" and the investigation which he claims was harassment. The investigation initially stemmed solely from an independent event – the November 2019 anonymous ethics hotline complaint. There is no evidence to suggest that this complaint was in any way related to any of Gumm's prior complaints, or that the caller was even aware of Gumm's comments.

Yet, even if Gumm could show a hostile environment, summary judgment for AK Steel is still appropriate, "because a Title VII plaintiff must also prove that his or her employer tolerated or condoned the situation or that the employer knew or should have known of the alleged conduct and failed to take prompt remedial action." *Diamond v. USPS*, 29 Fed. Appx. 207, 212 (6th Cir. 2002) (internal citations omitted); *see also, Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000). Gumm never complained of retaliatory harassment during his employment with AK Steel.

Upon hire, Gumm received a copy of AK Steel's thorough Harassment and Workplace Violence policy, setting forth numerous ways in which an employee can report harassment. (Anti-Harassment Policy, R. 34-22, Page ID 750-751; New Hire Orientation, R. 34-23, Page ID 754.) Gumm understood the reporting mechanisms

36

as he received a copy of the Policy and he was disciplined and ultimately terminated based on an Ethics and Compliance Hotline complaint. Despite this policy, Gumm unreasonably failed to take advantage of any preventative or corrective opportunities provided by AK Steel. *Morris*, 201 F.3d at 792. During his deposition, Gumm confirmed that he made three (and only three) complaints during the course of his employment – none of which related to any alleged harassment.

Even if Gumm's claims of retaliatory harassment are not barred for procedural reasons, he is unable to establish a prima facie case and the decision of the district court should be affirmed.

## CONCLUSION

Plaintiff-Appellant's appeal is without merit and summary judgment was appropriately granted to Defendant-Appellee AK Steel Corp. The District Court's decision should be affirmed in its entirety.

Respectfully submitted,

BODMAN PLC

*/s/ Melissa M. Tetreau* (P80864)
Melissa M. Tetreau (P80864)
201 W. Big Beaver, Suite 500
Troy, MI 48084
(248) 743-6000
mtetreau@bodmanlaw.com
Attorney for Defendant-Appellee AK Steel Corp.

Dated: December 11, 2024

37

4857-6655-0014_4

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 7,132 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Respectfully submitted,

BODMAN PLC

By: */s/ Melissa M. Tetreau* (P80864)
Melissa M. Tetreau (P80864)
201 W. Big Beaver, Suite 500
Troy, MI 48084
(248) 743-6000
mtetreau@bodmanlaw.com
Attorney for Defendant-Appellee AK Steel Corp.

Dated: December 11, 2024

4857-6655-0014_4

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Fed. R. App. P 25, I hereby certify that on December 11, 2024, I electronically filed the foregoing document through the court's electronic filing system, and that it has been served on all counsel of record through the court's electronic filing system.

By:   */s/Melissa M. Tetreau*

4857-6655-0014_4

## ADDENDUM: RELEVANT DISTRICT COURT DOCUMENTS

The Appellee designates as relevant these documents in the district court's electronic record, Eastern District of Michigan case number 2:21-cv-12441:

| Record Entry No. | Document Description | PAGE ID Range |
|---|---|---|
| 1 | Complaint | 1-9 |
| 34 | Defendant's Motion for Summary Judgment | 293-325 |
| 34-2 | Deposition of Peter Gumm | 330-355 |
| 34-3 | Deposition of Annette Gibbons | 374-410 |
| 34-4 | Application for Salaried Employment | 444-445 |
| 34-5 | Combs Declaration | 447-448 |
| 34-6 | Deposition of LaDale Combs | 450-490 |
| 34-7 | Deposition of Jason Dearth | 519-543 |
| 34-8 | 2018 Annual Assessment | 567-572 |
| 34-9 | Deposition of Joseph Skubic | 574-634 |
| 34-10 | Deposition of Brian Bishop | 678-696 |
| 34-11 | Nowitzke Exit Interview | 717 |
| 34-12 | November 4, 2019 Verbal Reprimand | 719 |
| 34-13 | November 1, 2019 Suspension | 721 |
| 34-14 | November 25, 2019 Ethics Hotline Complaint | 723-724 |
| 34-15 | Skubic Notes from December 2019 Meeting with Gumm | 726 |
| 34-16 | Skubic Notes from Meetings with Shift Managers | 728-733 |
| 34-17 | Declarations of Shift Managers | 735-738 |
| 34-18 | Gumm's EEOC Charge | 740 |
| 34-19 | Skubic Notes from January 2020 Meeting with Gumm | 742 |
| 34-22 | AK Steel Anti-Harassment Policy | 750-752 |
| 34-23 | Orientation Checklist | 754 |
| 34-24 | *Soehner v. Time Warner Cable, Inc.* | 756-763 |

4857-6655-0014_4

| 40-2 | *French v. MidMichigan Medical Center-Gladwin* | 1313-1318 |
|------|--------------------------------------------------|-----------|
| 45   | Opinion and Order granting summary judgment       | 1327-1364 |
| 48   | Gumm's Motion for Reconsideration                 | 1387-1400 |
| 49   | Opinion and Order denying reconsideration         | 1405-1412 |

4857-6655-0014_4